**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| VIDEO SOLUTIONS PTE LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-0222-JRG |
| | § | |
| CISCO SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |

**CLAIM CONSTRUCTION ORDER**

Video Solutions PTE Ltd. alleges infringement by Cisco Systems, Inc., of claims from U.S. Patents 8,446,452, 8,446,823, and 9,204,099, each of which relates to video conferencing.[1] The parties dispute the scope of seven groups of terms from those patents. Having considered the parties' briefing and arguments during an August 13, 2024 hearing, the Court resolves the disputes as follows.

# I. BACKGROUND

## A. U.S. Patent 8,446,452

The '452 Patent, entitled "Video Rate Adaption for Congestion Control," relates to "dynamically adjusting video encoding and input parameters for enhancing a videoconferencing experience over a best effort network." '452 Patent at 1:7–9. In best-effort networks, as opposed to managed networks, transmission parameters "are subject to relatively large and variable transmission impairments, such as jitter, delays, lost packets, etc., as a result of network congestion." *Id.* at

[1] Video Solutions also asserted U.S. Patent 8,649,426, but the parties had no claim-construction disputes from that patent, and have now dismissed all claims based on that patent. Dkt. No. 120.

1:43–48. That results in "choppy" video of "poor quality," which is an "uncomfortable experience for the user." *Id.* at 1:51–54.

Generally, the patent teaches determining "[a]n approximately optimized data transmission rate" for network performance between two endpoints based on statistical data. '452 Patent at [57]. For example, Claim 1 recites:

> 1. A method of exchanging videoconference data between a first **endpoint** and a second **endpoint** via a network, comprising:
>
> receiving at the first **endpoint** statistical data that are based on first videoconference data transmitted previously from the first **endpoint** to the second **endpoint** via the network, the statistical data determined at the second **endpoint** and relating to network performance characteristics during a known time-interval of transmitting the first videoconference data thereto;
>
> determining, based on the statistical data, a recommended data transmission rate for the network performance characteristics;
>
> capturing second videoconference data relating to the same videoconference at a time that is later than capturing of the first videoconference data at a settable frame rate and video resolution;
>
> adjusting the output bit rate of a video encoder associated with the first **endpoint**, so as to support transmission of videoconference data via the network at approximately the recommended data transmission rate if the recommended data transmission rate falls within a predetermined range of output bit rates tolerated by the video encoder;
>
> if the recommended data transmission rate falls outside said predetermined range, adjusting the frame rate or video resolution to maintain the output bit rate of said video encoder within said predetermined range; and
>
> encoding the second videoconference data with the video encoder to provide output data for transmission via the

network.

*Id.* at 10:13–43 (disputed term in bold). From this patent, the parties only dispute the scope of "endpoint."

**B. U.S. Patent 8,446,823**

The '823 Patent relates to "managing the flow of time-sensitive data, such as voice or audio," in packet networks. '823 Patent at 1:7–9. The patent explains that, when streaming multiple video sources over an IP network, simultaneous "I-frames" create traffic peaks. *Id.* at 1:37–39. I-frames include data related to the entire frame, as opposed to P-frames, which are smaller and only include information about changes in content relative to the last displayed frame. *See id.* at 1:23–36. The patent explains that, due to network controls, some I-frames may be discarded because of congestion. *Id.* at 1:39–42. "This problem can occur when multiple video conference calls are in process and particularly in the case of multi-party conferences when the same video source is connected to two or more remote endpoints." *Id.* at 1:42–45.

To address this problem, the '823 Patent teaches delaying streams so peaks in the different streams don't coincide. '823 Patent at [57]. For example, Figure 3 (below) shows "a typical video signal in the prior art" in which "video data from different sources [is] not synchronized." *Id.* at 2:50, 3:22–23. "[P]eaks from different sources . . . will always coincide if the same source streams to multiple destinations." *Id.* at 3:25–28. Problematically, however, the router through which the data flows "typically discards any data . . . exceed[ing] the cap [49a,]" which results in degraded video. *Id.* at 3:35–39.




**FIG. 3 (left) and FIG. 4 of the '823 Patent, showing synchronized and de-synchronized data peaks, respectively**

In contrast, Figure 4 (above, right) shows a video signal with de-synchronized data peaks. In Figure 4, "connection 44 has the greatest RTD and no further delay has been added." '823 Patent at 2:51–52. The method applies a delay to the connection 48 so its peaks don't align with the peaks of connection 44. *Id.* at 5:22–24. "The peaks in the resultant aggregate LAN traffic therefore do not exceed the arbitrary traffic cap as they do in FIG. 3." *Id.* at 5:24–26.

The parties' disputes from the patent focus on Claim 1, which recites:

> 1. A method of managing multiple data streams transported through a common communications resource in a packet network, wherein data flowing through said resource travels in both directions, and wherein each stream is subject to data peaks, comprising:
>
> **establishing logical two-way connections through the common communications resource between one or more near endpoints and one or more far endpoints**,
>
> determining an undelayed round trip delay for each said logical two-way connection,
>
> determining the maximum round trip delay among all said logical two-way connections,
>
> preparing each of said data streams for transmission over respective said logical connections from a said near **endpoint** to a said far **endpoint**,

> **determining the location of said data peaks in said data streams**,
>
> transmitting said data streams over said respective logical two-way connections to said one or more far **endpoints**, and
>
> delaying the transmission of one or more of said data streams that are transmitted over a said logical two-way connection having an undelayed round trip delay less than the maximum round trip delay by an amount **dependent on the location of said peaks** to reduce the degree of coincidence in the data peaks of different streams **without increasing the maximum round trip delay for the logical two-way connections**.

’823 Patent at 6:66–7:26 (disputed terms in bold).

### C. U.S. Patent 9,204,099

The ’099 Patent explains “[m]ulti-party videoconferences are typically hosted by a Multi-party Control Unit (MCU)” that “consolidates all the video feeds from the end points and presents appropriate video images to each of the end points of all the video camera and collaboration material video feeds in the conference. ’099 Patent at 1:34–39. MCUs, however, only “permit limited independent control of what images are promoted to full-scale size” during the conference. *Id.* at 1:40–41. Moreover, MCUs don’t provide “a sense of physical location or proximity of materials in the conference,” and “[n]o physical layout information is preserved or inferred in presentation.” *Id.* at 1:45–47.

To address these drawbacks, the patent teaches a teleconferencing system that displays “a filmstrip containing simultaneous images or icons representing the participants . . . in a spatial relationship that represents their real-world or virtual-world spatial relationships.” ’099 Patent at [57]. This gives a participant “a sense of position of people and things with respect to each other,” which “resolves the ambiguity of what or who is being looked at or spoken to.” *Id.* at 3:24–25.

Much of the disclosure relates to the topology of the videoconference's endpoints. In particular, the patent differentiates between the "star" topology of the prior art and a "mesh configuration":

> In a multipoint conference employing an MCU[,] endpoints are interconnected in a star, or multi-star, topology. In an alternative configuration, known as mesh configuration and illustrated in FIG. 2, each endpoint is connected directly to each other endpoint in the conference. In such an arrangement each endpoint has complete freedom to present video and other collaboration material uniquely and independently of the way it is presented at other endpoints.

'099 Patent at 2:33–40.




**FIG. 2 of the '099 Patent, which "shows a typical mesh connected four-party call." '099 Patent at 4:42.**

The parties' disputes relate to Claim 3 and Claim 10. Claim 3 recites:

> 3. A teleconferencing system comprising:
>
> a plurality of endpoints, at least some of which are connected in a **mesh configuration** and at least one of which is connected in a non-mesh configuration to a selected one of the **mesh-connected endpoints**, and which are configured such that a film strip with frames containing reduced-size video feeds from **the conference participants** is displayed at the mesh endpoints;
>
> a proxy at the selected **mesh-connected endpoint** for the non-

> mesh connected endpoint and connected to each of the **mesh-connected endpoints** to receive video feeds from the **mesh-connected endpoints** for the non-mesh connected endpoint;
>
> a server associated with the proxy for serving the film strip with frames containing reduced-size video feeds from the mesh-connected **conference participants** to the non-mesh connected endpoint; and
>
> a control connection permitting a user located at the non-mesh connected endpoint to select a video feed on the film strip for promotion to full size and to initiate transfer of the full size video feed to the non-mesh connected endpoint.

'099 Patent at 18:25–46 (disputed terms in bold).

## II. LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363,

1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is

presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of, and solutions to, problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Neither party's briefing directly addresses the level of ordinary skill in the art, but their experts generally agree on that question. Plaintiff's expert opines a skilled artisan "would have had at least a degree in electrical engineering, computer science, or a similar field with at least 2–3 years of experience with data networks and video streaming systems or other comparable professional experience." Cole Decl., Dkt. No. 78-5 ¶ 31. Cisco's expert's opinion is similar. *See* Almeroth Decl., Dkt. No. 81-1 ¶ 40 (characterizing a skilled artisan as one with "a bachelor's degree in computer science, computer engineering, electrical engineering, or equivalent, and approximately three years of work experience relating to video teleconferencing systems"). Because Plaintiff's proposed experience level is unbounded, reciting *at least* 2–3 years of experience, the Court adopts Cisco's characterization for its analysis, but notes neither party argues resolving the present disputes turn on which level of ordinary skill the Court adopts.

## IV. THE DISPUTED TERMS

### A. "endpoints" ('542 Patent, Claims 1, 2, 15, 21; '823 Patent, Claims 1, 7; '099 Patent, Claims 3, 4, 5, 10)

| Video Solutions's Construction | Cisco's Construction |
|---|---|
| Plain and ordinary meaning. If construed, Video Solutions proposes:<br>"device or collection of devices on a network that enable(s) an end user to exchange information with computers over the network" | "a device or collection of devices that an end user views and accesses to send or receive communications over a network" |

The parties dispute the scope of "endpoint," which appears in claims from all three patents. According to Cisco, the dispute concerns whether an endpoint "can also include midpoint devices in a network, like servers, that are not viewed or accessed by a user to send or receive communications." Dkt. No. 81 at 6. Cisco calls VS's construction overbroad and conflicting with the intrinsic evidence. *Id.* at 10–11. It also says VS's construction "lacks any limiting principle and fails to provide 'objective boundaries,'" thus taking the "end" out of "endpoint." *Id*. Moreover, says Cisco, VS's construction is inconsistent with its IPR position, in which VS argued a cited reference didn't disclose an "endpoint" because the mapped element was connected to a central server. *Id.* at 11–12.

VS, however, accuses Cisco of seeking to limit an "endpoint" to one specific embodiment disclosed in Figure 9 of the '099 Patent. Dkt. No. 78 at 7. It also criticizes Cisco's inclusion of "views and accesses" as part of its construction. *Id.* at 8. Concerning Cisco's argument that VS's construction would include "midpoints," VS says it is unclear what Cisco means by "midpoint." Dkt. No. 82 at 2.

The dispute concerns the line of demarcation between an "endpoint" and "the network," and both parties' positions are somewhat vague on that question. For example, Cisco suggests an

"endpoint" cannot be a server, but extrinsic evidence shows otherwise. *See* Ex. 1 to Cole Decl., Dkt. No. 78-5 at 81 ("Endpoints are physical devices that connect to and exchange information with a computer network. Some examples of endpoints are mobile devices, desktop computers, virtual machines, embedded devices, and servers."). Moreover, Cisco's construction requires a "user," but an endpoint could include devices like "embedded devices," "security systems, smart speakers, and thermostats." *Id.* Not only do those types of devices not have "users" in the traditional sense of someone operating a computer, but they need not necessarily be "viewed" or "accessed" as required by Cisco's construction. On the other hand, VS's construction is too broad, and would effectively include any device in the data path to what VS calls the network "backbone," like routers or switches.

The patent figures help draw the proper line between "endpoint" and "network." For example, Figures 1–2 of the '823 Patent show an endpoint (1) connected through a LAN, router (5), and network (8) to three other endpoints (2, 3, 4). '823 Patent at fig.1. The specification explains the network "is understood to include all equipment necessary for IP connectivity between the locations [of the endpoints]. In particular, the network will include many routers, similar to 5 shown [in Figure 1] and other equipment," '823 Patent at 4:35–36, which strongly suggests "routers" are not "endpoints." Figure 2 shows the hardware of Figure 1 as only video displays (12, 13), transmitters (26), receivers (16), video sources (22), a desynch control (32) for delaying the video streams, and delay blocks (52), which are all elements expected in computers or video conferencing equipment. Given that, nothing about Figures 1–2 suggests the scope of "endpoint" is so broad as to include routers, switches, or other network infrastructure.

The extrinsic evidence cited by VS's expert shows the same. For example, one source calls an "endpoint" a "point of entry" into a network. Ex. 3 to Cole Decl., Dkt. No. 78-5 at 97. Another

source calls "endpoints"

> physical devices that can connect to and communicate over a network. *Since these devices are where data flow starts and ends*, they're called endpoints. Any hardware or virtual application that emulates a physical device can be considered an endpoint device if it can connect to and exchange information across a TCP/IP network.

Ex. 4 to Cole Decl., Dkt. No. 78-5 at 110 (emphasis added). Similarly, the IEEE defines an "endpoint" as "a consumer or producer of data on a communication link." *endpoint*, The Authoritative Dictionary of IEEE Standards Terms, Dkt. No. 78-5 at 143 (p.381 of the dictionary). *See also* Cole Depo. Tr., Dkt. No. 81-2 at 46:3–6 ("But I guess endpoint would be where the end user connects to the network to be able to exchange information with other entities on the network."). Notably, none of these references suggest "endpoint" includes routers or switches.

In many respects, this dispute is as much about the meaning of "the network" as it is "endpoint." VS treats any device that is not part of what it calls the network "backbone" as part of an "endpoint." *See* Hr'g Tr., Dkt. No. 117 at 9:20–10:9 (explaining its intent with "device or collection of devices on a network" is "to encompass the devices, for example, here in the courtroom, in the backroom that would get you to the internet backbone").

But that position lacks support in the intrinsic record or extrinsic evidence. VS points to no reference to the network "backbone" in the intrinsic record, nor do any of the definitions cited by VS's expert reference a network "backbone" or suggest an endpoint includes, for example, LAN components or the routing/switching functionality required to "reach" that backbone. *See* Cole Decl., Dkt. No. 78-5 ¶ 58.

If anything, the evidence contradicts that notion. For example, Figure 1 of the '823 Patent distinguishes between two endpoints (1a) at a location (1) and a LAN (6) and router (5) the endpoints use to reach the network. Moreover, the '823 Patent explains "[t]he IP Network shown could

be, for example, a corporate private network, the public internet or a combination of such networks," '823 Patent at 3:4–6, which undercuts any notion of the network being limited to what VS calls "the backbone." Similarly, Figure 1 of the '452 Patent shows two endpoints (2, 4) "interconnected via an IP Network 6, e.g., the Internet," '452 Patent at 4:32–33, but nothing in that figure shows any routing or switching functionality in either endpoint.

The definitions cited by VS's expert show an endpoint is a device where data flow starts or ends, or where data is consumed or produced. Based on those definitions and the intrinsic record, the Court construes "endpoint" as "a device or collection of devices, where data flow starts or ends, that connect to and exchange information over a computer network."

### B. "establishing logical two-way connections through the common communications resource between one or more near endpoints and one or more far endpoints" ('823 Patent, Claim 1)

| Video Solutions's Construction | Cisco's Construction |
|---|---|
| Plain and ordinary meaning, which is:<br>"establishing one or more logical two-way connections through the common communication resource between each of one or more near endpoints and each of one or more far endpoints" | "establishing logical two-way connections from one or more endpoints through the common communications resource to one or more far endpoints, and vice versa" |

This dispute concerns the devices between which the required "logical two-way connection" must exist. VS says this limitation "require[s] plural 'logical two-way connection<u>s</u>' to be established 'between one or more near endpoints and one or more far endpoints." Dkt. No. 78 at 10 (emphasis in original). In other words, as long as the "connection" between two devices is somewhere in the "common communications resource," the limitation is satisfied for infringement purposes. Cisco, however, asserts the "established logical two-way connection" is between two endpoints. Dkt. No. 81 at 13. Thus, the question is whether "between one or more near endpoints

and one or more far endpoints" modifies "logical two-way connections" (Cisco's position) or "common communications resource" (VS's position).




**Cisco's framing of the dispute, with green showing VS's position and blue showing Cisco's position. *See* Dkt. No. 81 at 13.**

VS focuses on the claims and specification for support. It says the claims "never limit the number of logical two-way connections between a near endpoint and a far endpoint." Dkt. No. 78 at 10. VS then says "the number of connections between endpoints is not limited by the connections of any preferred embodiment." *Id.* (citing '823 Patent at 4:42–45, 5:27–28 ("It will be understood that this method may be used for any number of connections.")). "Thus," concludes VS, "the claims and specification encompass embodiments in which a data stream may be transmitted from a near endpoint to a far endpoint via multiple 'logical two-way connections,' [which] may be between endpoints and/or intermediate devices such as routers, switches, nodes, or servers." *Id.*; *see also* Dkt. No. 82 at 4 (citing '823 Patent at fig.1, 3:1–6, 4:32–38, 5:27–28, 5:41–44).

The Court agrees with Cisco for a number of reasons. For one, the written description discloses the "common communications resource" as part of the IP network (8), and no description

of the internal workings or routing of the network shows a logical connection as existing solely within that network. In fact, the patent's only reference to "logical two-way connections" depicts those connections as between endpoints. *See* '823 Patent at 4:42–43 (explaining "[c]onnections 42 and 44 [of Figure 2] form one logical two-way connection").

Moreover, VS's construction does not help solve the stated problem, which is "reduc[ing] the degree of coincidence in the data peaks of different streams." '823 Patent at 1:63–65. The patent explains that, "[b]y measuring the Round Trip Delay (RTD) for each video connection, data associated with the connection(s) having the least RTD are delayed to smooth net traffic." *Id.* at 1:66–2:1. This aligns with the last limitation of Claim 1, thus supporting the notion that the "connections" are established between the endpoints rather than simply somewhere in the "common communications resource."

None of the intrinsic evidence cited by VS undercuts this conclusion. For example, VS points to the specification's statements that "[i]t will be understood that this method may be used for any number of connections," and "that there are numerous alternative ways of implementing the described function." Dkt. No. 78 at 10 (citing '823 Patent at 5:27–28, 5:41–44, 6:46–48). But neither statement supports one interpretation over the other. VS also says Figure 1 supports its position by showing a router with "three IP connections" to endpoints, but "IP connections" are not the same as the "logical two-way connections."

The Court concludes "between one or more near endpoints and one or more far endpoints" modifies "logical two-way connections" rather than "common communications resource," and the Court adopts Cisco's construction of "establishing logical two-way connections from one or more endpoints through the common communications resource to one or more far endpoints, and vice versa."

### C. "determining the location of said data peaks in said data streams" / "dependent on the location of said data peaks" ('823 Patent, Claim 1)

| Term | Video Solutions's Construction | Cisco's Construction |
|---|---|---|
| "determining the location of said data peaks in said data streams" | Plain and ordinary meaning | "determining the location of data peaks in each data stream to be transmitted" |
| "dependent on the location of said data peaks" | Plain and ordinary meaning | "according to the location of the data peaks in the data streams that have not been transmitted" |

According to Cisco, "[t]he parties' dispute . . . centers on whether the claims' 'determining' step happens *before* the 'transmitting' step (Cisco's position), or whether the 'determining' step can happen 'before *or during*' the 'transmitting' step (Video Solutions' position)." Dkt. No. 81 at 16. Cisco says the specification confirms its understanding of the language, "disclosing exclusively that the 'determining' and 'delaying' steps happen before the transmitting step." Dkt. No. 81 at 17 (citing '823 Patent at fig.2, 5:5–7, 6:35–37).

According to VS, "the specification contemplates determining the location of data peaks, and delaying the transmission of data streams, either before or during the transmission process." Dkt. No. 78 at 12 (citing Cole Decl., Dkt. No. 78-5 ¶¶ 96–103, 110–17). That position at least somewhat turns on the construction of the prior term, as VS argues a "skilled artisan would understand that intermediate devices [like routers, switches, gateways, nodes, and servers] could determine the location of data peaks and delay data streams during the transmission process." *Id.* at 12–13.

This dispute merely reframes the prior dispute in a different way. For example, VS's position stems from its belief a skilled artisan "would understand these same steps could also be

performed at any intermediate device(s) between a near endpoint and a far endpoint." Dkt. No. 82 at 6; *see also* Dkt. No. 78 at 12 (suggesting "the specification contemplates that the transmission of a data stream . . . can include any number of connections through a common communications resource between endpoints, and these connections may comprise multiple logical two-way connections that include intermediate devices"). The claim, however, requires "preparing each of said data streams for transmission over said respective said logical connections from a near endpoint to a said far endpoint," '823 Patent at 7:11–13 (emphasis added), and the recited "logical connections" are not "connections" between "intermediate devices such as routers, switches, gateways, nodes, servers, etc.[,]" Dkt. No. 82 at 6, but rather only between endpoints. *See* Part IV.B. *supra*.

That said, the Court rejects the order-of-steps limitation sought by Cisco. For one, there is no discussion in the papers on whether this remains an issue if, as is the case, the "logical two-way connections" must be between endpoints. All of the arguments about the order of steps related to that question. Moreover, the Court sees no inherent reason why the "determining" step must precede the "transmitting" step, unlike, for example, the "determining" and "delaying" steps. For those steps, a skilled artisan would understand, as a matter of logic, that the transmission cannot be delayed "by an amount dependent on the location of said peaks" until the "location of said data peaks in said data streams" is "determined." *See TALtech Ltd. v. Esquel Apparel, Inc.*, 279 F. App'x 974, 978 (Fed. Cir. 2008) (noting that "[g]enerally, there is no presumption of order [of steps, but courts] will find that the claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires such a narrow construction"). At least one of the data streams, the one with the maximum round trip delay, is not delayed at all. Accordingly, the Court adopts a "plain and ordinary meaning" for these terms.

**D. "without increasing the maximum round-trip delay for the logical two-way connections" ('823 Patent, Claim 1)**

| Video Solutions's Construction | Cisco's Construction |
|---|---|
| Plain and ordinary meaning, which is: "without increasing the maximum value of the round trip delay for any of the logical two-way connections" | "without increasing round trip delay for the endpoint with the greatest undelayed round trip delay" |

According to VS, "[t]he parties dispute whether [this phrase] can refer to any determined maximum value for round trip delay (as Video Solutions proposes) or whether the 'maximum round trip delay' can only refer to the greatest measured round trip delay value (as Cisco proposes)." Dkt. No. 78 at 13. Again arguing a "logical two-way connection" can exist between intermediate devices," VS says the "maximum round-trip delay" is not limited to measured values and could be a "cap" or "maximum allowable delay." *Id.* at 15.

The Court adopts Cisco's construction for two reasons. First, the Court has already resolved whether the proper construction for these terms contemplates "logical two-way connections" between something other than endpoints—it doesn't. *See* Part IV.B. *supra*. Second, nothing in the patent suggests "maximum round trip delay" is a cap or maximum allowable delay. The patent concerns "reduc[ing] the degree of coincidence in the data peaks of different streams without increasing the maximum round trip delay for the data streams." '823 Patent at [57]. Reading "maximum round trip delay" as a "cap" or "parameter" makes no sense in the context of that objective.

For support, VS points only to the specification's explanation that "[t]he amount of delay per stream also has a maximum value as to cap the total delay." Dkt. No. 78 at 15 (quoting '823 Patent at 5:16–17). That's true, but that's a different issue. In fact, the immediately prior sentences support Cisco's position:

> The deSync control 32 determines the delay of *each stream* so as to separate the peaks that would otherwise coincide. It does so by delaying streams with the least RTD more than those with higher RTD such that *the stream with the highest RTD is not delayed at all.*

’823 Patent at 5:12–16 (emphasis added); *see also id.* at 6:22–24 (“Because the destination with the greatest RTD is taken as reference, it will be evident that it will not be further delayed by this process.”). That passage says nothing about a “cap,” and contemplates that the stream with the highest RTD—i.e., the “maximum round trip delay”—*could* be delayed, but isn’t. *Only then* does the patent explain that each stream that *is* delayed has a cap on the amount of delay. *See id.* at 5:16–17. In other words, the system might delay a stream, but no more than a certain amount, which is a concept unrelated to the “maximum round trip delay” of the disputed phrase. Accordingly, the Court rejects VS’s position that “the maximum round-trip delay” refers to a “cap” or “parameter” and construes this phrase as “without increasing round trip delay for the endpoint with the greatest undelayed round trip delay” (Cisco’s construction).

**E. "mesh configuration," "mesh-connected endpoint," "mesh endpoint(s)" ('099 Patent, Claims 3, 10)**

| Term | Video Solutions's Construction | Cisco's Construction |
|---|---|---|
| "mesh configuration" | Plain and ordinary meaning, which is: "network configuration where the endpoints connect directly or indirectly to one another and can send data to and from one another without the data passing through the same central server" | "A configuration of endpoints in which each endpoint is connected directly to each other endpoint and streams its data independently to and from each other endpoint" |
| "mesh-connected endpoint" / "mesh endpoint(s) | Plain and ordinary meaning, which is: "endpoint(s) connected in a network configuration where the endpoints connect directly or indirectly to one another and can send data to and from one another without the data passing through the same central server" | "An endpoint that is connected directly to each other mesh- connected endpoint and streams its data independently to and from each other mesh-connected endpoint" |

The claims recite "a plurality of endpoints, at least some of which are connected in a mesh configuration." '099 Patent at 18:26–27 (Claim 3); *id.* at 19:2–3 (Claim 10). The parties mainly dispute whether a "mesh configuration" and "mesh-connected endpoints" must be *directly* connected to all other endpoints in the mesh, or whether they may be *indirectly* connected to one another.

Cisco bases its construction of these terms on what it considers lexicography. Specifically, it points to the patent's explanation that, in a type of configuration "known as mesh configuration and illustrated in FIG. 2, each endpoint is connected *directly* to each other endpoint in the conference." Dkt. No. 81 at 20 (quoting '099 Patent at 2:34–37; emphasis added); *see also id.* (citing '099 Patent at 5:21–27 ("In a mesh connection[,] media streams and data from all devices at each

endpoint . . . are streamed independently to and from all other endpoints.”)). And even if these statements are not definitional, Cisco considers them “highly persuasive evidence” of the terms’ meanings. *Id.* at 21.

VS says the connection between “mesh endpoints” may be direct or indirect. Dkt. No. 78 at 17–23. It stresses the word “directly” does not appear in the claim language, and the specification discloses embodiments in which endpoints are connected *indirectly*. *Id.* at 18–19 (citing ’099 Patent at fig.1, fig.10, 5:15–16, 16:36–39, and Cole Decl., Dkt. No. 78-5 ¶¶ 37–38, 63–68, 73, 76, 80). So far as any lexicography, VS argues the passages on which Cisco relies are exemplary. Dkt. No. 82 at 6.

In the Background, the patent explains that, in a “mesh configuration,” “each endpoint is connected directly to each other endpoint in the conference.” ’099 Patent at 2:34–37. Notably, there is no suggestion a “mesh configuration” might also include configurations where endpoints are *indirectly* connected. Rather, the patent says that what a skilled artisan knows as “mesh configuration” is shown in Figure 2, which has direct connections. That amounts to lexicography.




**FIG. 8 of the ’099 Patent**

Importantly, despite VS’s assertions to the contrary, nothing in the patent is inconsistent

with that definition. In fact, the patent only discloses two types of configurations—either a "mesh" configuration or a "star" configuration. For example, regarding Figure 8 (above), the specification calls the three left-most endpoints (81, 82, 83) "mesh connected. That is to say each endpoint transmits all its media . . . to all other mesh endpoints via multiple connections 88." '099 Patent at 15:59–62. The specification then describes the top-most endpoint (84) as a "star" endpoint. *Id.* at 15:62–63 (noting "[s]tar endpoint 84 connects to any one of the mesh endpoints"). Under VS's reasoning, that should also be a "mesh" endpoint, because it is indirectly connected to two endpoints (81, 83) through the endpoint (82). This shows the applicant considered all endpoints within a "mesh" to be directly connected to one another. Otherwise, there would be no distinction in the patent between a "mesh" and a "star" endpoint.

VS counters with Figures 1 and 10. It says Figure 1 shows "a typical mesh connected videoconference end point" that "is connected to others via the network 19." Dkt. No. 78 at 19 (citing '099 Patent at 4:39–40). Regarding Figure 10, VS argues endpoints 81 and 83 are indirectly connected, and the specification explains endpoint 82 is on the same mesh conference with those endpoints. *Id.* at 18 (citing '099 Patent at 16:47–53).

But neither figure helps VS's position. Figure 1 simply shows an endpoint, and nothing about that figure provides insight on whether a mesh-connected endpoint may have indirect connections to other endpoints, at least not at the communication level about which the patent is concerned. Rather, Figure 1 simply shows that the endpoint communicates with other endpoints through a network.[2] As for Figure 10, it notes "some mesh connections have been omitted for

---

[2] At most, Figure 1 would undercut an attempt to limit "direct" connections to connections that don't use a network—e.g., direct *physical* connections. Cisco's briefing does not suggest its

clarity," and that figure uses the same numbering as Figure 9, which shows the endpoints (81, 83) *directly* connected to one another.

VS also points to the prosecution history and extrinsic evidence. Regarding the former, it points to U.S. Published Application 2008/0170550 (Liu) as disclosing a "wireless local area mesh network" that contemplates nodes "communicating with each other directly or indirectly." Dkt. No. 78 at 21 As for extrinsic evidence, VS cites references showing messages that can hop from node to node. *Id.* at 22.

At most, however, Liu and the extrinsic evidence suggest the plain meaning of "mesh network" might include direct or indirect connections, but that does not overcome the clear definition of "mesh network" provided by the applicant and supported by the rest of the specification. Accordingly, the Court construes:

- "mesh configuration" as "a configuration of endpoints in which each endpoint is connected directly to each other endpoint and may stream its data independently to and from each other endpoint"; and
- "mesh-connected endpoint" and "mesh endpoint" as "an endpoint that is connected directly to each other mesh-connected endpoint and may stream its data independently to and from each other mesh-connected endpoint."

**F. "the conference participants" ('099 Patent, Claims 3, 10)**

| Video Solutions's Construction | Cisco's Construction |
|---|---|
| "videoconference participants at the at least some mesh-connected endpoints and the at least one non-mesh connected endpoint" | "individuals participating in a videoconference from an endpoint" |

position is that two endpoints cannot be "directly connected" through a network, and the Court would reject that position.

Claim 3 concerns a teleconferencing system comprising

> a plurality of endpoints, at least some of which are connected in a mesh configuration and at least one of which is connected in a non-mesh configuration to a selected one of the mesh-connected endpoints, and which are configured such that a film strip with frames containing reduced-size video feeds from *the conference participants* is displayed at the mesh endpoints . . . .

’099 Patent at 18:26–32 (emphasis added); *see also id.* at 19:7–8 (reciting, in Claim 10’s preamble, “a film strip with frames containing reduced-size video feeds from the conference participants is displayed at the mesh endpoints”). Cisco asserts VS’s construction requires “that individuals at every recited endpoint ‘participate’ in the conference.” Dkt. No. 81 at 26. It notes the PTAB’s conclusion that “the claim does not appear to include language that requires any of the ‘conference participants’ to be associated with the non-mesh connected endpoint.” *Id.* at 27 (quoting Decision Granting Institution, Dkt. No. 81-7 at 16).

VS says the claim language requires “conference participants” at “at least some” mesh-connected endpoints and “at least one” non-mesh connected endpoint. Dkt. No. 82 at 9. It points to the Summary’s explanation that “it would be desirable to permit the non-mesh connected end-point to enjoy the same features as the mesh-connected endpoints.” Dkt. No. 78 at 26–27 (quoting ’099 Patent at 4:9–11).

Each claim recites a plurality of endpoints, limits what composes those endpoints, and then refers back to the plurality of endpoints to specify that only the mesh endpoints must be configured a certain way. The claims do not, however, limit where the conference participants are located—at least not when the claims first recite the term.[3] Thus, the Court agrees with the PTAB’s

[3] Each claim later recites “the mesh-connected conference participants.” ’099 Patent at 18:40; *see also id.* at 19:15 (reciting, in Claim 10, “the mesh-connected conference participants”).

conclusion that "[t]he claim[s] do[] not appear to include language that requires any of the 'conference participants' to be associated with the non-mesh endpoints," *see* Decision Granting Institution, Dkt. No. 81-7 at 16, and construes this phrase as "the individuals participating in a videoconference from an endpoint."

### G. The Film-Strip Limitations:

**"a plurality of endpoints . . . which are configured such that a film strip with . . . video feeds from the conference participants is displayed" ('099 Patent, Claim 3)**

**"wherein a film strip with frames containing reduced-size video feeds from the conference participants is displayed at the mesh endpoints" ('099 Patent, Claim 10)**

| Term | Video Solutions's Construction | Cisco's Construction |
| --- | --- | --- |
| "a plurality of endpoints . . . which are configured such that a film strip with . . . video feeds from the conference participants is displayed" (Claim 3) | Plain and ordinary meaning | "a plurality of endpoints that are configured to always display a film strip with the video feeds from all of the conference participants when video feeds from at least two conference participants are available" |
| "wherein a film strip with frames containing reduced-size video feeds from the conference participants is displayed at the mesh endpoints" (Claim 10) | Plain and ordinary meaning | "wherein a film strip with the video feeds from all of the conference participants is always displayed at the mesh endpoints when video feeds from at least two conference participants are available" |

According to Cisco, the parties dispute whether the recited film strips must "always be displayed with all available video feeds from the conference participants." Dkt. No. 81 at 28. Cisco says it must, because the "film strip" is described as a feature of the invention as a whole. *Id.* VS replies that Cisco "wrongly fixates" on embodiments of the invention, and the specification contemplates film strips that are not so limiting. Dkt. No. 82 at 10 (citing '099 Patent at fig.3).

On whether video feeds from *all* conference participants must be displayed, the Court agrees with Cisco. Although the parties focus on the meaning of "film strip," this dispute more precisely concerns the phrase "the conference participants," which could be read as "all conference participants" (as Cisco proposes) or "one or more of the conference participants." On that question, Cisco presents persuasive evidence from the specification that shows displaying "collaboration material from all conferenced parties" is "a key differentiator from prior art endpoints." Dkt. No. 81 at 28 (citing '099 Patent at 5:42–47).

In its reply, VS points to Figure 3, but that figure supports Cisco's position. Figure 3 is prior art "in which promotion means that a smaller video is *removed on promotion*." '099 Patent at 5:45–47 (emphasis added); *see also id.* at 4:42 (noting "FIGS. 3a to 3c show typical prior art screen layouts"). In Figures 4a and 4b, however, which "show typical screen layouts in accordance with embodiments of the invention," *id.* at 4:43–44, promotion does not remove the associated smaller video.

Whether the proper construction includes the word "always" is a slightly different issue. An instrumentality *always* infringes when it is configured as required by the claims. If, however, the instrumentality changes between a first configuration that meets all claim limitations and a second configuration that doesn't, it *always* infringes in the first configuration and *never* infringes in the second. As such, including "always" imports an unnecessary temporal element into the claims that is superfluous and potentially confusing to a jury.

The Court construes:

- "a plurality of endpoints . . . which are configured such that a film strip with . . . video feeds from the conference participants is displayed" in Claim 3 as ""a plurality of endpoints . . . which are configured such that a film strip

with . . . video feeds from all conference participants is displayed"; and

- "wherein a film strip with frames containing reduced-size video feeds from the conference participants is displayed at the mesh endpoints" in Claim 10 as "wherein a film strip with frames containing reduced-size video feeds from all conference participants is displayed at the mesh endpoints"

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "endpoints"<br>('542 Patent, Claims 1, 2, 15, 21; '823 Patent, Claims 1, 7; '099 Patent, Claims 3, 4, 5, 10) | "a device or collection of devices, where data flow starts or ends, that connect to and exchange information over a computer network" |
| "establishing logical two-way connections through the common communications resource between one or more near endpoints and one or more far endpoints"<br>('823 Patent, Claim 10) | "establishing logical two-way connections from one or more endpoints through the common communications resource to one or more far endpoints, and vice versa" |
| "determining the location of said data peaks in said data streams"<br>('823 Patent, Claim 1) | Plain and ordinary meaning |
| "dependent on the location of said data peaks"<br>('823 Patent, Claim 1) | Plain and ordinary meaning |
| "without increasing the maximum round-trip delay for the logical two-way connections"<br>('823 Patent, Claim 1) | "without increasing round trip delay for the endpoint with the greatest undelayed round trip delay" |
| "mesh configuration"<br>('099 Patent, Claims 3, 10) | "a configuration of endpoints in which each endpoint is connected directly to each other endpoint and may stream its data independently to and from each other endpoint" |

| | |
|---|---|
| "mesh-connected endpoint," "mesh end-point(s)"<br>('099 Patent, Claims 3, 10) | "an endpoint that is connected directly to each other mesh-connected endpoint and may stream its data independently to and from each other mesh-connected endpoint" |
| "the conference participants"<br>('099 Patent, Claims 3, 10) | "the individuals participating in a video-conference from an endpoint" |
| "a plurality of endpoints . . . which are config-ured such that a film strip with . . . video feeds from the conference participants is displayed"<br>('099 Patent, Claim 3) | "a plurality of endpoints . . . which are configured such that a film strip with . . . video feeds from all conference participants is displayed" |
| "wherein a film strip with frames containing re-duced-size video feeds from the conference par-ticipants is displayed at the mesh endpoints"<br>('099 Patent, Claim 10) | "wherein a film strip with frames containing reduced-size video feeds from all conference participants is displayed at the mesh end-points" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 4th day of November, 2024.**

Roy S. Payne

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE