*Public Version*

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| VIDEO SOLUTIONS PTE. LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:23-cv-00222-JRG-RSP |
| | ) | |
| CISCO SYSTEMS, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## VIDEO SOLUTIONS PTE. LTD.'s
## MOTION TO STRIKE CERTAIN OPINIONS OF LAUREN KINDLER

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

## TABLE OF CONTENTS

I.    **BACKGROUND** ........................................................................................................ **2**

II.   **ARGUMENT** ............................................................................................................ **4**

    A.   **Kindler's Damages Analysis Should Be Excluded Because She Improperly Relies On Non-Comparable Agreements And Fails To Conduct An Apportionment Analysis ... 5**

    B.   **The Court Should Exclude Kindler's Royalty Base Opinions** ................................... **12**

    C.   **The Court Should Exclude Kindler's Opinions On Non-Infringing Alternatives** .... **13**

III.  **CONCLUSION** ..................................................................................................... **15**

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).......................................................................................1, 2, 4, 5, 11, 12

*Ericsson, Inc. v. D-Link Sys., Inc*,
    773 F.3d 1201, 1226 (Fed. Cir. 2014).........................................................................6

*Estech Sys. IP, LLC v. Carvana LLC*,
    No. 2:21-CV-00482-JRG-RSP, 2023 WL 3292881, at *7–8 (E.D. Tex. May 5, 2023)..........12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341, 1353 (Fed. Cir. 1999)......................................................................14

*ICM Controls Corp. v. Honeywell Int'l Inc.*,
    No. 5:12-CV-1766 (LEK/ATB), 2021 WL 3403734, at *3 (N.D.N.Y. Aug. 4, 2021)............14

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
    87 F. Supp. 3d 928, 948–49 (N.D. Cal. 2015) .........................................................15

*In re ChanBond, LLC Pat. Litig.*,
    No. CV 15-842-RGA, 2020 WL 550786, at *3 (D. Del. Feb. 4, 2020).........................4, 9, 11

*Integra Lifesciences I, Ltd. v. Merk KGaA*,
    331 F.3d 860, 871 (Fed. Cir. 2003)...........................................................................6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137, 147 (1999)........................................................................................5

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51, 75–76 (Fed. Cir. 2012).......................................................................10

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    No. 2:06-CV-348, 2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011)...........................14

*Longhorn HD LLC. v. NetScout Sys., Inc.*,
    No. 2:20-CV-00349-JRG-RSP, 2022 WL 991696, at *4 (E.D. Tex. Mar. 31, 2022) ............14

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301, 1324 (Fed. Cir. 2009)......................................................................11

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
    545 U.S. 193 (2005)................................................................................................6

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358, 1374 (Fed. Cir. 2021) ................................................................. 6-7

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  No. 14-CV-03657-SI, 2019 WL 2863585, at *11–15 (N.D. Cal. July 2, 2019).....................12
  10 F.4th 1358 (Fed. Cir. 2021) ............................................................................12

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361, 1376 (Fed. Cir. 2021) ....................................................1, 6, 7, 11

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
  No. 12-1013-RGA, 2015 WL 456154, at *2 (D. Del.  Jan. 30, 2015)................................6, 11

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292, 1315 (Fed. Cir. 2011)........................................................................5

*Vectura Ltd. v. Glaxosmithkline LLC*,
  981 F.3d 1030, 1040 (Fed. Cir. 2020)........................................................................6

*WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,
  No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752, at *7 (M.D. Fla. July 14, 2022) .........14, 15

**Rules**

Fed. R. Evid. 702 .........................................................................................1, 2, 4, 5, 12

Fed. R. Civ. P. 37..........................................................................................1, 2, 12

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Video Solutions asserts that videoconferencing technology used by Cisco's Webex product infringes three of its U.S. patents.[1] Video Solutions' damages expert, Dr. Robert Maness, individually apportioned the incremental benefits from Cisco's use of each Asserted Patent in Webex videoconferencing in order to exclude all of Webex's other, non-accused functionalities. In response, Cisco's damages expert, Lauren Kindler, (1) relies on sales and offers to sell portfolios that include the Asserted Patents for her reasonable royalty opinion that post-date the hypothetical negotiation by years and (2) criticizes Dr. Maness for, *inter alia*, allegedly using the wrong royalty base and not considering purported non-infringing alternatives. Video Solutions now moves to exclude Kindler's (1) reasonable royalty valuation in its entirety under Fed. R. Evid. 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and (2) royalty base and non-infringing alternative opinions under Rule 702, *Daubert*, and Fed. R. Civ. P. 37 ("Rule 37").

First, Kindler's affirmative reasonable royalty opinion should be excluded in its entirety because it rests on unreliable inputs (among other things). *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021). Kindler accepts that the hypothetical negotiation between Cisco and Magor Corporation, then-owner of the Asserted Patents, would have occurred in May 2013, when Magor was a going concern that sought to compete against Cisco's Webex in the videoconferencing market. But Kindler's alleged damage calculation relies upon (a) the price paid by N. Harris Corporation ("Harris") to purchase Magor out of bankruptcy in November 2017; (b) Harris' subsequent, unsuccessful attempts to sell the Asserted Patents in 2020, 2021 and 2022; and (c) Video Solutions' ultimate purchase of the Asserted Patents in November 2022. These events are not comparable in time or circumstance to the hypothetical negotiation that would have occurred in May 2013 between Magor and Cisco. Kindler's reasonable royalty should be excluded.

---

[1] The Asserted Patents are U.S. Patent Nos., 8,446,452 (the "'452 patent"), 8,446,823 (the "'823 patent") and 9,204,099 (the "'099 patent").

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

*See* Ex. A, Kindler Rep., ¶¶ 10, 11, 55–164, 214–220, 223.

Second, Kindler criticizes Dr. Maness because he used the royalty base that Cisco had identified as the proper royalty base in its interrogatory responses. Kindler asserts that Maness should have used a different royalty base, which Kindler constructed after fact discovery closed, primarily based on a conversation she had with a Cisco employee. Because Kindler's newly proposed royalty base is both untimely disclosed and unreliable, it should be excluded under Rule 37, Rule 702, and *Daubert*. *See id.*, ¶¶ 12(b)(i), 39(a)(ii), 110, 172(b)(i), 179(a), 180–81.

Third, Kindler asserts that Cisco could have switched to available, acceptable non-infringing alternatives to the accused Webex product in May 2013 (or any time thereafter) in a matter of weeks and at a cost less than $115,000. No company has used these purported non-infringing alternatives, however, in the manner proposed by Cisco here. There is also no reliable support that the alleged non-infringing alternatives were commercially available or acceptable, as required by law; indeed, Kindler herself places no weight on them for her opinions. In the absence of reliable support that any purported non-infringing alternatives were acceptable or available, these opinions should also be excluded under Rule 702, *Daubert*, and/or Rule 37. *See id.*, ¶¶ 10(g), 13(c), 117–20, 163(g), 172(d), 221–22.

## I.    BACKGROUND

Kindler opines that the hypothetical negotiation for all three Asserted Patents would have occurred in May 2013, when the first two patents issued—presupposing that Cisco had implemented the patented technology in Webex at that time. Ex. A, Kindler Rep., ¶ 53.[2]  At that time, the Asserted Patents were owned by Magor, a company in Canada. *Id.* According to Kindler,

---

[2] The '452 and '823 patents issued on May 21, 2013. The '099 patent did not issue until 2015, and Cisco did not add its functionality to Webex until 2018; nonetheless, Kindler assumes that the '099 patent would be included in the parties' hypothetical negotiations in May of 2013. Ex. A, Kindler Rep., ¶ 53.

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

"Magor's principal [*sic*] activities pertained to the design, development and marketing of a visual collaboration software platform which integrated personal computer collaboration, high definition video, and wideband audio for the enterprise market." *Id.*, ¶ 17. Indeed, in March of 2013, Magor had launched its Aerus suite of videoconferencing products, which incorporated Magor's patented inventions and sought to compete with Cisco's Webex. *Id.*, ¶¶ 19, 91; *see also id.*, ¶¶ 39(b), 85, 110, 113, 163(d), 200 (each referring to Magor's competing "patent-practicing products").

Magor's attempt to compete with Cisco's Webex videoconferencing product and others in the videoconferencing market was unsuccessful, however. *Id.*, ¶¶ 56–60. Kindler lays out a variety of reasons for Magor's lack of success, including lack of brand recognition, unduly complex controls, poor ergonomics, poor financial management, and others. *Id.*, ¶¶ 103–13. None of Kindler's criticisms of Magor's business operations, however, have anything to do with the patented technology that she assumes was being used by both Magor and Cisco during this same period. *Id.* Indeed, during the same period, Cisco's sales of Webex and its associated revenues— which also used the technology of the Asserted Patents—soared. *Id.*, ¶¶ 37–39 & Exhibit 1.1.

Ultimately, Magor was forced to declare bankruptcy, and Harris, a Canadian conglomerate, apparently saw an opportunity to extract some value from Magor's bankruptcy estate. *Id.*, ¶ 60. It purchased Magor's assets, including the Asserted Patents, out of bankruptcy for $2.5 million Canadian dollars, which equated to approximately $2.13 million U.S. dollars. *Id.*

Harris continued to service certain Magor videoconferencing customers but, by early 2020, had determined that it would sell ten (10) patents that had been part of Magor's patent portfolio, including the three Asserted Patents. Harris sought to market the Magor patent portfolio through a patent broker, Planetary IP, LLC ("Planetary"). *Id.*, ¶¶ 63–67. One of Planetary's attempts to market the Magor patent portfolio included contacting a patent aggregator named Allied Securities

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Trust ("AST"). *Id.* AST is a cooperative that includes several large technology companies, including Cisco. *Id.*, ¶ 66. AST uses a bidding process where patent brokers and others can offer patents at either fixed or negotiable prices for consideration by its members and, if enough members express interest, AST seeks to acquire the offered patents. Ex. F, Binns Dep., 107:23–112:12; *see also In re ChanBond, LLC Pat. Litig.*, No. CV 15-842-RGA, 2020 WL 550786, at *3 (D. Del. Feb. 4, 2020) (discussing AST in connection with a *Daubert* challenge).

Planetary made several attempts to market the Magor patent portfolio through AST, with proposed sales prices in the " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A, Kindler Rep., ¶¶ 63–67. There was no interest expressed by AST at any of these prices. *Id.* ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Harris and Planetary continued to market the Magor portfolio for sale and, ultimately, Video Solutions acquired the Magor portfolio for ▮▮▮▮▮▮ at the end of 2022 for the purposes of engaging in potential litigation. *Id.*, ¶¶ 69–72.; Ex. B, Kindler Dep. at 216:17–217:17.

According to documents relied upon by Kindler from May of 2013 through August 27, 2024, Cisco has made ▮▮▮▮▮▮ from Webex sales, including nearly ▮▮▮▮▮▮ in the U.S. alone. Ex. A, Kindler Rep., Exhibit 1.1. The Asserted Patents do not expire until 2032–33, which reflects approximately eight more years of potential royalties in the future. *Id.*, ¶ 99.

## II.     ARGUMENT

Federal Rule of Evidence 702 states that expert opinions are admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the expert testimony is based on sufficient facts or data; (c) the testimony is the result of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

"imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). To satisfy these standards in a patent case, testimony and evidence related to patent damages must be "tied to the facts of the case"—otherwise, "the testimony must be excluded." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert*, 509 U.S. at 591).

### A.    Kindler's Damages Analysis Should Be Excluded Because She Improperly Relies On Non-Comparable Agreements And Fails To Conduct An Apportionment Analysis

Kindler's report purports to analyze all of the *Georgia-Pacific* Factors, but the only apparent basis for Kindler's damages calculations are (1) Harris's purchase of the Asserted Patents as part of the Magor bankruptcy estate in November 2017; (2) Planetary's marketing of the Magor patent portfolio through the AST process, which occurred in two rounds in 2021 and 2022; and (3) Harris's ultimate sale of the Asserted Patents to Video Solutions in November 2022. Ex. A, Kindler Rep,. ¶¶ 10(a)-(b), 62, 68, 72, 163(a)-(b), 164; Ex. B, Kindler Dep., 24:22–27:15.[3] Kindler purports to assess these transactions under *Georgia-Pacific* Factor 1. Ex. A, Kindler Rep., ¶¶ 55–73. None of these events, however, are legally comparable to the hypothetical negotiation that would have occurred between Magor and Cisco in May 2013.

Where, as here, "multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the

---

[3] Kindler opines that the reasonable royalty amount would be "in the range of $2.5 million to no more than $4.5 million." Ex. A, Kindler Rep, ¶ 164. She reaches this range by citing (a) Harris' purchase of the Magor assets out of bankruptcy reflects a willingness by Magor to accept a maximum of a ▮▮▮▮▮ payment for the Asserted Patents; (b) the AST process reflects a maximum market value of between ▮▮▮▮▮ for the Asserted Patents; and Harris' sale of the Asserted Patents reflects a ▮▮▮▮▮. *See, e.g., id.*, ¶¶ 163(a), (b)(ii)-(iii). Although Kindler also cites a purported offer to purchase the Asserted Patents for $200,000 (*id.*, ¶ 163(b)(i)) and a purported ability to design around the Asserted Patents for less than $115,000 (*id.*, ¶ 119), she places no apparent weight on these events to arrive at her $2.5 to $4.5 million damages range.

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

infringing features of the product, and no more." *Omega*, 13 F.4th at 1376 (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). "[W]hen a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Id.* at 1376–77 (quoting *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020)). However, "comparisons to other licenses are inherently suspect because economic and scientific risks [between licenses] vary greatly." *Integra Lifesciences I, Ltd. v. Merk KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds by Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005).

In *Omega,* the Federal Circuit explained how an expert, like Kindler, may rely on one or more agreements for a patent damages analysis in lieu of conducting an apportionment analysis:

> [A] damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have built-in apportionment. . . . Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent. . . . For built-in apportionment to apply the license must be sufficiently comparable in that principles of apportionment were effectively baked into" the purportedly comparable license.

13 F.4th at 1377 (internal quotations omitted).

This requirement includes accounting for the economic differences between transactions that an expert seeks to rely upon and the hypothetical negotiation. *See, e.g., Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. 12-1013-RGA, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (excluding expert testimony on license agreements that were not economically comparable to the hypothetical negotiation). The touchstone of the inquiry is whether the expert "accounted for the differences" between the circumstances and the technology at issue. *MLC Intell. Prop., LLC v. Micron Tech., Inc*., 10 F.4th 1358, 1374 (Fed. Cir. 2021) (excluding opinions that failed to account for differences between technologies and did not analyze the difference in number of

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

patents in the hypothetical negotiation and proffered license). Kindler fails to address—much less establish—that the "principles of apportionment were effectively baked into" any of the transactions or attempted transactions she relies upon. *Omega*, 13 F.4th at 1377.

First, *Georgia-Pacific* Factor 1 assesses "[t]he royalties received by the patentee for the licensing of the patents in suit."[4] None of the events relied upon by Kindler are licenses, none generated royalties, and none sought to measure the incremental benefits of the Asserted Patents. Nor were they available to the parties to the hypothetical negotiation in May of 2013 to guide their negotiations. *Id.* They are not a proper basis for a *Georgia-Pacific* Factor 1 analysis. *See* Ex. A, Kindler Rep., ¶¶ 55–73. Ms. Kindler nonetheless tried justify relying on these *post hoc* events at her deposition as allegedly "informative as to how the parties would have viewed things earlier in time." Ex. B, Kindler Dep. at 17:1-2. But there is no record evidence from which she or anyone else could reliably conclude that in ***May 2013*** the parties expected Magor to fail as a business and go bankrupt in ***2017***. Indeed, Magor had just launched a new product. *Id.*, ¶ 19.

Second, Kindler fails to account for other differences between these events and the hypothetical negotiation in her application of *Georgia-Pacific* Factor 1. *See* Ex. A, Kindler Rep., ¶¶ 55–73. As noted, in May 2013 Magor had just launched its Aerus product to compete with Cisco's accused Webex product and Cisco was already using the technology in two of the three Asserted Patents in Webex. *Id.*, ¶¶ 19, 52. Even as a willing licensor, Magor would have been highly motivated to extract the maximum amount in royalties from its much larger and better-established competitor and Cisco would have been highly motivated to acquire a license to avoid making changes to the Webex product. Although Kindler purports to address certain differences between the hypothetical negotiation in May 2013 and the transactions and attempted transactions

---

[4] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

she relies upon for her opinions, Kindler fails to explain why the parties would agree lump-sum royalty range of between $2.5 and 4.5 million in May 2013 knowing that the Asserted Patents would continue to exist and be enforceable for the next 20 years. *See* Ex. A, Kindler Rep., ¶¶ 55-73.  Moreover, Kindler made no effort to explain how any of these transactions or attempted transactions related to the technical benefits of the Asserted Patents or reflect the incremental benefits of the Asserted Patents.

Rather, in the Harris-Magor purchase, Kindler used a 2012 academic article to adjust the "recovery value" of the Magor assets (*i.e.*, the purchase price Harris paid to the Magor bankruptcy trustee) to estimate a "going concern value" of the Magor assets. *See* Ex. A, Kindler Rep., ¶ 61(e). She then opined that her estimated "going concern value" of the Magor assets reflected a potential cap on a reasonable royalty payment. Id., ¶ 62. But Kindler made no effort to explain how the going-concern value of Magor in November 2017 related to the going-concern value of Magor in May 2013—the date of the hypothetical negotiation—or explain how a going-concern value of Magor on either date related to the incremental value of any of the patents it owned (if at all). Indeed, at her deposition, Kindler admitted that she did not know what "going concern value" even measured. Ex. B, Kindler Dep., 52:16-19 ("Q. …. Can you explain the term 'going concern value' what that measures? Not really. I'm not an accountant. I'm an economist.").[5]

For the Planetary-AST attempted transactions, Planetary sought to generate interest in a patent portfolio that it had no interest in practicing and Harris had no interest in keeping. Planetary was a broker trying to liquidate some of Harris's patents, and AST and its members were evaluating

---

[5] Going-concern value generally refers to "a value that assumes that the company will remain in business indefinitely and continue to be profitable." *See* https://www.investopedia.com/terms/g/going_concern_value.asp (last visited November 2, 2024). As in 2017 Magor had failed to compete with Cisco and its other much larger competitors in the videoconferencing space, it is not clear how Magor's going-concern value in 2017 is relevant in any respect to the hypothetical negotiation in May 2013. Kindler, who does not address the issue in her Report and admitted she is not knowledgeable about the concept, is certainly in no position to try to explain these issues to a jury.

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

whether to acquire these patents for "defensive" purposes—i.e., to avoid litigation risk, not because they wanted the Asserted Patents to practice them. Ex. F, Binns Dep., 107:23–112:12. And AST admitted it performed no evaluation of the technology or incremental benefits of the Asserted Patents and was unaware of any such evaluation. *Id.,* 109:10–112:12. For itself, Cisco has blocked all inquiry into whether it analyzed the Asserted Patents as part of the AST process on privilege grounds. See Dkt. 104 (Video Solutions' Motion to Compel).

Finally, in the Harris-Video Solutions transaction, Harris was again in a position where it sought to liquidate patents. Video Solutions, on the other hand, was interested in acquiring the Asserted Patents for the purposes of licensing and potential litigation. Moreover, Harris was incentivized to dispose of the patent assets for a minimal transaction cost, and Video Solutions believed the only way that it might be able to monetize the Asserted Patents would be through costly litigation, like the present case, and sought to minimize the acquisition cost despite the inherent value of the portfolio. Ex. A, Kindler Rep., ¶ 72(d); Ex. B, Kindler Dep., 216:17–217:17. In a patent acquisition that includes the expectation of a lawsuit "the thing being valued in the transaction [is] this litigation," and the "transaction...is not comparable to the hypothetical negotiation." *ChanBond*, 2020 WL 550786, at *2.

Moreover, conspicuously absent from any of Kindler's analyses is how these transactions relate to Cisco's ongoing use of the Asserted Patents, which would have been a critical input to the May 2013 hypothetical negotiation. *See* Ex. A, Kindler Rep., ¶¶ 55–73. Nor does Kindler make any attempt to explain how these transactions or attempted transactions in any way measure the technical contributions of the Asserted Patents to the Webex videoconferencing products. *Id.* Nor does Kindler address how these three events from 2017, 2020, 2021, and 2022 reflect, if at all, the incremental profits Cisco would have expected to earn in May 2013 by practicing the Asserted

-9-

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Patents over their nearly 20-year lifespan. *Id.* Instead, Kindler builds an echo chamber in which she finds each successive transaction (or attempted transaction) relevant because they are all consistent with one another at the time they occurred—***not*** because they are consistent with the hypothetical negotiation between Magor and Cisco in May 2013. *See, e.g.,* Ex. B, Kindler Dep., 217:22–218:11.

Third, Kindler applies these three events to the wrong reasonable royalty period. Under black-letter Federal Circuit law, Kindler was supposed to perform her analysis of a proper royalty rate and royalty base ***without*** regard to any limitation on damages imposed by the six-year statute of limitations applied to patent claims. *See, e.g.*, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75–76 (Fed. Cir. 2012) (discussing the need to focus on the circumstances of the parties as of the hypothetical negotiation date and not take into account later limitations on damages, such as the statute of limitations). Kindler, however, only sought to determine the outcome of a hypothetical negotiation that occurred in May 2013 for a license starting in May of 20**17**—when the recoverable damages period began under the limitations period. *See, e.g.,* Ex. A, Kindler Rep., ¶ 61(f); Ex. B, Kindler Dep., 86:7–13. In other words, Kindler's reasonable royalty opinions assume that, when the parties sat down at the negotiating table in May 2013, they would have agreed that Cisco could infringe the Asserted Patents for four years without paying Magor (a competitor) a reasonably royalty. This error fundamentally confuses the reasonable royalty analysis, which seeks to reconstruct the positions of the parties as of just before the date of first infringement, with the statutory limitation on damages that is subsequently imposed on the reasonable royalty analysis. *LaserDynamics*, 694 F.3d at 75–76. Moreover, Kindler's error infected multiple aspects of her *Georgia-Pacific* analysis, including inflating the purported relevance of the

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Harris-Magor purchase out of bankruptcy (Ex. A, Kindler Rep., ¶ 61(e)) and deflating the term of the hypothetical license under *Georgia-Pacific* Factor 7 (*id.,* ¶ 100).

Fourth, at least one district court has rejected reliance on an AST offering to identify a reasonable royalty or the incremental benefits associated a patented technology. In *ChanBond*, Judge Andrews in Delaware excluded a single offering of patents through AST as unreliable under *Daubert*. 2020 WL 550786, at *3. Judge Andrews further concluded that the fact that AST and its members did not respond to the offer should also be excluded on *Daubert* and Fed. R. Evid. 403 grounds because, in that instance, there was no "willing licensee." *Id.* ("Because no company responded to the 2012 AST offer, the situation does not represent a hypothetical negotiation with a willing licensee."). Kindler's improper reliance on the AST bidding process is a basis to exclude her opinions entirely, but her AST opinions should be excluded regardless.

Finally, Kindler's reliance on events that occurred years after the hypothetical negotiation date and after Magor had declared bankruptcy are fundamentally different from the hypothetical negotiation, which presumes a willing licensor, a willing licensee, and a presumption that the Asserted Patents are both valid and infringed. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (explaining that the hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began"). Although Kindler's Report purports to explain how these events differ from the hypothetical negotiation—by attempting to minimize those differences (*see* Ex. A, ¶¶ 56–73)—at no time does she tie these discussions to the incremental value of the Asserted Patents to Webex, which is the entire point of the hypothetical negotiation analysis. *See, e.g.*, *Omega*, 13 F.4th at 1376; *see also Sprint*, 2015 WL 456154, at *2 ("Ms. Davis's report provides examples of how the four license agreements differ from the hypothetical agreements,

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

she does not explain how her methodology accounts for these differences."). Kindler's affirmative opinions on damages should be excluded.

### B.    The Court Should Exclude Kindler's Royalty Base Opinions

Kindler also criticizes Dr. Maness's royalty base as inflated because, according to her, Dr. Maness potentially included non-U.S. uses of the methods covered by the Asserted Patents. She argues that he should have used a different royalty base, which Kindler apparently created while preparing her report. Dr. Maness, however, used the royalty base that ***Cisco*** had stated was proper in its interrogatory responses, which make no mention of Kindler's newly created royalty base. Accordingly, Kindler's newly proposed royalty base and her criticism of Dr. Maness for not using it should be excluded under Rule 37 and as unreliable under *Daubert* and Rule 702. *Estech Sys. IP, LLC v. Carvana LLC*, No. 2:21-CV-00482-JRG-RSP, 2023 WL 3292881, at *7–8 (E.D. Tex. May 5, 2023) (excluding portions of Kindler's damages report under Rule 37 where it relied upon information not timely disclosed during the fact discovery period); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-CV-03657-SI, 2019 WL 2863585, at *11–15 (N.D. Cal. July 2, 2019) (excluding royalty rate opinion where, *inter alia*, it was not disclosed in interrogatory responses), *aff'd*, 10 F.4th 1358 (Fed. Cir. 2021).

Video Solutions served its Interrogatory No. 3 on August 30, 2023, which requested, among other things, that Cisco "state [its] sales and other distribution figures, revenues, costs, and profits from launch to the present for each version of each of the Accused Methods performed by Cisco ***in the United States***[.]" Ex. C at pp. 8–9 (emphasis added). Cisco supplemented its answer to Interrogatory No. 3 three times by citing, under Fed. R. Civ.P. 33(d), to spreadsheets containing "quarterly revenue for product ID numbers (PIDs) associated with Webex's accused video conferencing functionality from May 2017 to February 2024 for customers with a 'ship to' address in the United States" as measuring the revenue associated with the "performance" of the "Accused

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Methods … in the United States."  Ex. D at pp. 8, 10–11, 14. Thus, that is the metric Dr. Maness used for the royalty base in his report.[6]

Kindler, however, apparently disagrees with Cisco's interrogatory response that "ship to" addresses properly measured the revenue associated with the "performance" of the "Accused Methods … in the United States." *Id.* Thus, Kindler created a different royalty base that ignored Cisco's interrogatory responses and was instead based on usage data from Cisco showing when videoconferences had a U.S. participant. Ex. A, ¶¶ 12(b)(i), 39(a)(ii), 110, 172(b)(i), 179(a), 180–81. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Kindler's new royalty base was not only undisclosed in discovery, it is unreliable.  A litigant cannot jettison its interrogatory responses in favor of a guesstimate provided in a conversation between one of their employees and their expert. Ms. Kindler's royalty base opinions should be excluded.

**C.**    **The Court Should Exclude Kindler's Opinions On Non-Infringing Alternatives**

Kindler also testifies as to the existence of up to nine purportedly available, acceptable non-infringing alternatives in her Report—although neither she and Cisco's damages expert, Dr. Kevin Almeroth, provide any evidence that these purported alternatives were on the market in 2013 or today. "When an alleged alternative is not on the market during the accounting period, the

---

[6] Dr. Maness noted in his report that "ship to" data had the potential to both overcount ***and*** undercount uses of Webex in the United States, as U.S.-based firms may have international employees and international firms may have U.S. employees. Ex. E, Corrected Opening Expert Report of Dr. Robert Maness, ¶ 77 & n.141. Nonetheless, he accepted it as Cisco's measure of the use of Webex in the United States. *Id.*

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

court may reasonably infer that it was not available as a non-infringing alternative." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011) (quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341, 1353 (Fed. Cir. 1999)). Thus, "the burden shifts to the alleged infringer to demonstrate that the non-infringing alternative would have been available." *ICM Controls Corp. v. Honeywell Int'l Inc.*, No. 5:12-CV-1766 (LEK/ATB), 2021 WL 3403734, at *3 (N.D.N.Y. Aug. 4, 2021) (citing *id.*).

"A reliable opinion on whether a product is or is not a non-infringing alternative is incomplete without opining whether the product is both 'available' and 'acceptable' (or whether there are not any 'available' or 'acceptable' alternatives)[.]" *Longhorn HD LLC. v. NetScout Sys., Inc.*, No. 2:20-CV-00349-JRG-RSP, 2022 WL 991696, at *4 (E.D. Tex. Mar. 31, 2022). "Not only must the proposed alternatives be specifically noted, but their availability and acceptability must also be substantiated with record evidence." *WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752, at *7 (M.D. Fla. July 14, 2022) (citations omitted). Here, Kindler relies upon Almeroth's opinions that nine alternative designs would purportedly avoid infringement of the Asserted Patents and that each of these nine alternatives could, in theory, have been implemented as of the date of the hypothetical negotiation in May 2013. *See* Ex. A, Kindler Rep., ¶¶ 10(g), 13(c), 117–20, 163(g), 172(d), and 221–22.[7] But neither Kindler nor Almeroth provide any record evidence that the proposed non-infringing alternatives are actually ***commercially acceptable*** and ***available*** in the marketplace. Kindler's analysis of availability is limited to her discussions with a Cisco employee outside of fact discovery as to the purported costs associated with implementing the proposed non-infringing alternatives. Ex. A, Kindler Rep., ¶ 119. There is simply no analysis of availability or commercial acceptability.  *Id.*

---

[7] Video Solutions does not agree that any of these proposed alternatives are non-infringing.

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

And Almeroth only provides hypotheticals, with no evidence any alternative has even been implemented by anyone, even as an experiment. Ex. H, Almeroth Op. Rep., ¶¶ 799-829.

Thus, there is no support for any of these expert opinions concerning the commercial acceptability or availability of Cisco's proposed non-infringing alternatives in the record. Indeed, Cisco's relevant interrogatory responses on proposed non-infringing alternatives cite to none of Kindler's proposed cost data and fail to disclose several newly proposed non-infringing alternatives in their entirety. Ex. G, Cisco's Ninth Supplemental Objections and Responses to Video Solution's First Set of Interrogatories (No. 7) (failing to disclose Kindler's proposed non-infringing alternatives discussed in Ex. A, Kindler Rep., ¶¶ 118(a)(iv) [*sic*], 118(b)(iii), 118(b)(iv)).

Without a proper foundation in the record, expert opinions regarding purported non-infringing alternatives are unsupported and unreliable. *WhereverTV*, 2022 WL 2751752, at *7 ("Without research-and-development documentation, deposition testimony, or sworn declarations attesting to the potential existence of these many other alternatives, a factfinder would be left to guess at Comcast's design and implementation capabilities."). Similarly, Kindler's reliance on a conversation with a Cisco engineer that occurred outside the fact discovery period for the purposes of establishing whether a proposed non-infringing alternative is available or acceptable is inherently unreliable. *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 948–49 (N.D. Cal. 2015) (holding expert is precluded from relying on conversations with witnesses when information was not disclosed until after depositions took place). Kindler's opinions on non-infringing alternatives should be excluded.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant Video Solutions' motion.

Dated: November 4, 2024                    Respectfully submitted,
                                           */s/ Mark C. Nelson*

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

Mark C. Nelson (lead counsel)
TX Bar No. 00794361
Daniel A. Valenzuela
TX Bar No. 24067918
Juanita DeLoach
TX Bar No. 24064218
David Lisch
TX Bar No. 24077179
BARNES & THORNBURG LLP
2121 North Pearl Street, Ste. 700
Dallas, TX 75201
Tel: (214) 258-4200
Fax: (214) 258-4199
mark.nelson@btlaw.com
daniel.valenzuela@btlaw.com
juanita.deloach@btlaw.com
david.lisch@btlaw.com

Todd G. Vare
TX Bar No. 1845849
Jeff M. Barron
IN Bar No. 27730-49
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Tel: (317) 231-7735
Fax: (317) 231-7433
todd.vare@btlaw.com
jeff.barron@btlaw.com

Andrea Fair
TX Bar No. 24078488
Garrett Parish
TX Bar No. 24125824
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Tel: (903) 757-6400
Fax: (903) 757-2323
andrea@millerfairhenry.com
garrett@millerfairhenry.com

**COUNSEL FOR PLAINTIFF,
VIDEO SOLUTIONS PTE. LTD.**

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

## <u>CERTIFICATE OF CONFERENCE</u>

On November 4, 2024, counsel for Video Solutions and counsel for Cisco met and conferred pursuant to Local Rule CV-7(h) via a remote videoconference. During that conference, counsel for Video Solutions explained its positions regarding (a) deficiencies in Ms. Kindler's affirmative opinions on damages, including her improper reliance on later patent purchase agreements, (b) Video Solutions' position that her royalty base was improper, and (c) that Dr. Almeroth and Ms. Kindler did not provide reliable opinion testimony concerning the commercial availability or acceptability of the alleged non-infringing alternatives, all as detailed in this Motion. Counsel for Cisco disagreed with Video Solutions' positions on these issues.  The participants in the meet-and-confer included Mark Nelson (lead counsel for Video Solutions), Jared Bobrow (lead counsel for Cisco), Garrett Parish (local counsel for Video Solutions), and Melissa Richards Smith (local counsel for Cisco), among other counsel for the parties. The Parties were unable to resolve the dispute and are at an impasse. As such, this Motion is opposed.

*/s/ Mark C. Nelson*
Mark C. Nelson


*/s/ Garett Parish*
Garett Parish

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

<u>**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**</u>

I hereby certify that Video Solutions is authorized to file this document under seal because it contains and refers to information designated under the Protective Order that has been entered in this matter at Dkt. No. 34, which authorizes such filing.

<u>*/s/ Mark C. Nelson*</u>
Mark C. Nelson

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024 a copy of the foregoing document was served via the Court's ECF system on all parties who are deemed to have consented to electronic service.

*/s/ Mark C. Nelson*
Mark C. Nelson